**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**STATESVILLE DIVISION**
**CIVIL ACTION NO. 5:18-CV-00012-KDB-DSC**

| | | |
|---|---|---|
| **JAMES PARKS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **ORDER** |
| | ) | |
| **LOUISIANA-PACIFIC** | ) | |
| **CORPORATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

     **THIS MATTER** is before the Court on Defendant Louisiana-Pacific Corp.'s ("LP" or "Defendant") Motion for Summary Judgment (Doc. No. 18), which Plaintiff James Parks ("Plaintiff" or "Parks") opposes. The Court has carefully reviewed the motion and considered the parties' arguments, briefs and exhibits. For the reasons discussed below, the Court will **GRANT** the motion and enter Summary Judgment in favor of Defendant.

## I.     RELEVANT BACKGROUND

     This matter is a discrimination and hostile work environment action brought pursuant to 42 U.S.C. § 1981. Plaintiff filed this action against his former employer, LP, after he was terminated for failing to follow a written safety policy. Plaintiff asserts claims for hostile work environment, disparate treatment, and retaliation.

     LP is "one of the largest building products manufacturers in North America." (Doc. No. 26, at 2.) Plaintiff was originally hired by LP on June 14, 2004 as a temporary utility worker at its Roaring River manufacturing facility in North Carolina. (Doc. No. 32, at 3.) In December 2005, LP transferred Plaintiff to the maintenance department. (*Id.*) Plaintiff worked in

maintenance until his termination on March 23, 2015.  (*Id.*)  Over the course of his employment

at LP, Parks received "various promotions and pay raises."  (Doc. No. 26, at 4.)

## A.  Plaintiff's Safety Violation and Termination

The parties agree that LP has a written "Lock out/Tag out" ("LOTO") safety policy

applicable to all employees who perform maintenance on machines in the manufacturing facility.

The LOTO policy provides that, before performing any work on the machine, the employee must

turn off the machine's energy source at the breaker and place a lock on the switch.  (Doc. No. 26,

at 2.)  Second, the employee must verify that the machine has no power by attempting to switch

it on before beginning any work.  (*Id.*)  Citing the language of the LOTO policy, LP states that

violations of LOTO "will be viewed as an act of serious misconduct" but that "[i]n all cases

where discipline is being considered, the facts and merits of the specific event will be thoroughly

reviewed before corrective action is taken." (*Id.* at 3.)  Despite this written qualifier, Plaintiff

takes the position that all employees were unequivocally told that any LOTO violation resulted

in "automatic termination."  (Doc. No. 32, at 3.)   Plaintiff cites deposition testimony from his

son and fellow LP employee, Michael Lamont Houpe, in support of this assertion.

The parties agree that on March 18, 2015, Plaintiff violated the LOTO policy.  After

receiving a work order for a machine, Plaintiff inadvertently locked out a breaker directly below

the one that actually provided power to the machine.  (Doc. No. 32, at 5.)   The parties agree that

Plaintiff then failed to verify the machine had no power before beginning to work.  (*Id.*; Doc. No.

26, at 5.)  Citing Plaintiff's deposition testimony, LP contends that a foreman noticed Plaintiff's

mistake, and instructed Plaintiff to lock out the correct machine.  (Doc. No. 26, at 5.)  Again

citing Plaintiff's deposition testimony, LP asserts that Plaintiff then locked out the correct

machine, but again failed to perform the verification step of the LOTO procedure before beginning to work.[1] (*Id.*)

The parties agree that LP immediately suspended Plaintiff and performed an investigation of Plaintiff's LOTO violation. (Doc. No. 26, at 5; Doc. No. 22–27.) The investigators deemed the violation "willful" because "the employee understands the lockout process and chose not to complete verification prior to beginning the task." (*Id.*) Plaintiff was terminated on March 23, 2015. (Doc. No. 26, at 5.) LP states that when LP employees met with Plaintiff to terminate him, Plaintiff was informed that the LOTO violation was the sole reason for his firing. (*Id.*)

## B. Working Environment at LP

Plaintiff also asserts that LP's Roaring River facility was "infested with racists" while he was employed there. He testified to the following facts as evidence of this assertion:

- **Racial Slurs:**

  1. Plaintiff testified that shortly after he joined the maintenance department in 2005, he found a sign taped to his locker reading "We don't want n****rs in maintenance." (Doc. No. 32–9, at 46.) Plaintiff does not recall whether he reported this to LP. (*Id.*)

---

[1] This description of Plaintiff's LOTO violation is contradicted by the investigation report LP attached to its summary judgment filings. (Doc. No. 22–27.) The report, created days after the violation, states that the foreman entered the breaker room and noticed that Plaintiff had locked out the wrong machine. (*Id.*) The report states the foreman locked out the correct machine for Plaintiff, then walked to the area of the plant where the machine was located and informed Plaintiff he had locked out the incorrect machine. (*Id.*) Plaintiff then admitted to the foreman that he did not perform the verification step before beginning to work on the machine, as he was in a hurry and assumed he had locked out the correct machine. (*Id.*) The investigation report does not mention anything about a second failure to verify. (*Id.*) It is not clear why there is a discrepancy between Plaintiff's deposition testimony and the investigation report. However, given that Plaintiff does not dispute LP's description of the LOTO violation, which is based on Plaintiff's own testimony, this discrepancy is not material to the Court's determination of Defendant's Motion for Summary Judgment.

2. Plaintiff testified that an LP employee named Eddie Dancy called him "bootlip" and "blue gum" on two different occasions. (*Id.* at 41–42.) Plaintiff testified he complained to Jimmy Purdue after both incidents, and that Purdue told Plaintiff he would "take care of it." (*Id.*) Dancy later apologized to Plaintiff. (*Id.* at 43.) Plaintiff testified this occurred sometime around 2013 or 2014. (*Id.*)

3. Plaintiff testified he witnessed LP employees make racially derogatory jokes about African Americans. For example, Plaintiff witnessed LP employees reenact a comedy skit from the Dave Chappell Show in which an African American man is portrayed as a Ku Klux Klan leader. (*Id.* at 43–44.) Plaintiff testified he did not complain about this to LP. (*Id.*) Plaintiff could not remember which employees engaged in this activity. (*Id.*)

4. Plaintiff testified one LP employee named Rocky Edwards asked him if he was a drug dealer when the employee became aware Plaintiff lived in a nice area of town. (*Id.* at 45.) Plaintiff did not complain about this to LP (*Id.*) It is not clear from the deposition transcript when this incident occurred.

5. Plaintiff testified that an LP employee named Connelly Howard addressed him using the word "n****r." Plaintiff complained about this incident to Larry Johnson, who told Plaintiff he would investigate. (*Id.* at 53.) Plaintiff testified this occurred in 2015. (*Id.*)

- **Racial images:**

  1. Plaintiff testified he witnessed a vehicle in the LP employee parking lot displaying a bumper sticker stating "Obama/Osama, what's the difference?" and depicting a swastika. (*Id.* at 48.)

  2. Plaintiff testified that after President Barack Obama was elected to office, someone taped a cartoon from the newspaper depicting a gunman shooting a caricature of President Obama to his locker. (*Id.*) Plaintiff testified he complained about this incident to an individual named Lam Nguyen, who told Plaintiff he would "look into it," but Plaintiff never heard anything more about it. (*Id.* at 47.)

3. Parks testified he was subjected to symbols of racism on a "daily basis," including images of the confederate flag, which he testified he views as a symbol of the Ku Klux Klan. (*Id.* at 30.) He testified that individuals on the maintenance team had lunchboxes depicting the flag, and that he also saw images of the flag on hats, lockers, and in the bathrooms. (*Id.* at 30–31.) Plaintiff could not name any specific employees who displayed the confederate flag. (*Id.*) Plaintiff did not report this to LP. (*Id.*)

4. Park testified he saw the word "n****r" and the phrase "KKK" scratched into a bathroom stall in a bathroom he frequently used. (*Id.* at 31, 48.)

- **Pranks:**

    1. Plaintiff testified that someone placed a dead skunk in his locker and then welded it shut. Plaintiff could not recall the exact date of this incident, but stated that he complained to a former LP supervisor named Ernest Higgins, who retired in 2007. (*Id.* at 33–34.) Plaintiff stated that Higgins then held an emergency meeting about harassment "that same day." (*Id.* at 34.)

    2. Plaintiff testified that someone placed severed male deer genitalia on his personal belongings inside his locker. (*Id.*) Plaintiff could not recall the exact date of this incident, but testified that Higgins was still his supervisor at the time and that this incident occurred after the skunk incident. (*Id.*) Plaintiff testified he again complained to Higgins, who told Plaintiff he would "look into it," but that nothing else happened. (*Id.*)

    3. Plaintiff testified that his tools were hidden in locations far from his work area on "six or seven times." (*Id.* at 35.) Plaintiff testified that this was witnessed by an LP supervisor named Donnie Vanhoy. (*Id.*)

    4. Plaintiff testified that in early 2015, when he returned to work after taking medical leave, he found his locker stuffed with hundreds of freeze pop wrappers. (*Id.* at 36.) Plaintiff testified he complained to an LP supervisor named Danny Gambill about this, and that Gambill told him that "if they didn't like you, they wouldn't mess with you." (*Id.* at 39.)

Plaintiff's Opposition also cites to Houpe's deposition testimony describing incidents in which LP employees used racial slurs. Houpe testified that he personally witnessed the following incidents:

1. Houpe was told by an unnamed LP employee not to trust a lot of people at LP because "they called [him] the N-word behind [his] back an awful lot." (Doc. No. 32, at 6; Doc. No. 32–2, at 120.)

2. Houpe witnessed unnamed LP employees use the term "coon" and refer to Hispanic individuals as "wet backs" and "slick back n****rs." (Doc. No. 32-2, at 126.)

3. Houpe testified he observed swastikas and the word "n****r" "all over the place" and specifically in the bathrooms at LP. (*Id.* at 128.) He further testified that LP repainted "everything" and removed the slurs, but that "beforehand, they would be removed and then, you know, maybe a week later, somebody would put something else up there." (*Id.* at 128–29.)

Houpe also testified that at some point after Plaintiff complained[2] about discrimination, LP stopped allowing employees to wear "articles of clothing with rebel flags" to work and "started cracking down on it a little bit more." (*Id.* at 129.) Houpe testified that after Plaintiff complained about racism, LP "made this big thing" and "even had a safety meeting on it." (*Id.* at 130.)

Finally, Plaintiff cites to the deposition testimony of Shannon Parks, Plaintiff's wife, who also witnessed vehicles in the LP employee parking lot that displayed bumper stickers relating to President Obama, specifically one portraying President Obama being urinated on. (Doc. No. 32–10, at 47–48.) She further testified that at least three vehicles had stickers on them that she viewed as racist, but could not recall specifics as to what made her interpret them as racist. (*Id.*

---

[2] The deposition transcript does not make it clear what complaint is being referenced.

at 51.)  Parks testified she saw images that Plaintiff brought home from LP portraying President Obama with "monkey ears," and depicting a confederate flag.  (*Id.* at 49, 52, 54.)

The parties do not dispute that LP has adopted a written anti-harassment policy, anti-retaliation policy, equal employment opportunity policy, and affirmative action policy.  (Doc. Nos. 22–12, 22–13, 22–14, 22–15.)

## II.     LEGAL STANDARD

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  A factual dispute is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "A fact is material if it might affect the outcome of the suit under the governing law."  *Vannoy v. Federal Reserve Bank of Richmond*, 827 F.3d 296, 300 (4th Cir. 2016) (quoting *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013)).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact through citations to the pleadings, depositions, answers to interrogatories, admissions or affidavits in the record.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003).  "The burden on the moving party may be discharged by 'showing'. . . an absence of evidence to support the nonmoving party's case."  *Celotex*, 477 U.S. at 325.  Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial," *Id*. at 322 n.3.  The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment.  *Id*. at 324.

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party.  *Tolan v. Cotton*, 572 U.S. 650, 657 (2014); *see also Anderson*, 477 U.S. at 255.  "Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits."  *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568–69 (4th Cir. 2015) (quoting 10A Charles Alan Wright & Arthur R. Miller et al., Federal Practice & Procedure § 2728 (3d ed.1998)).  "The court therefore cannot weigh the evidence or make credibility determinations."  *Id*. at 569 (citing *Mercantile Peninsula Bank v. French* (*In re French*), 499 F.3d 345, 352 (4th Cir. 2007)).

However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (internal citations omitted).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  *Anderson*, 477 U.S. at 248.  Also, the mere argued existence of a factual dispute does not defeat an otherwise properly supported motion.  *Id*.  If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate. *Id*. at 249–50.

In the end, the question posed by a summary judgment motion is whether the evidence as applied to the governing legal rules "is so one-sided that one party must prevail as a matter of law." *Id*. at 252.

# III.    DISCUSSION

## A.    Hostile Work Environment

 Plaintiff first claims he was subjected to a hostile work environment at LP.  A hostile work environment exists "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." *Boyer–Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015). The elements for a claim of hostile work environment are the same under § 1981 and Title VII.  *Spriggs v. Diamond Auto Glass,* 242 F.3d 179, 184 (4th Cir. 2001).  To  survive summary judgment on a claim for hostile work environment, the plaintiff must demonstrate that a reasonable jury could find plaintiff's harassment was (1) unwelcome (2) based on the plaintiff's race; (3) sufficiently severe or pervasive enough to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) imputable to the employer.  *Boyer–Liberto*, 786 F.3d at 277.  Defendant argues Plaintiff's claim fails because the alleged harassing conduct was not "severe or pervasive," nor imputable to LP.

> 1.    The statute of limitations for § 1981 claims is four years, but the continuing violation doctrine may apply to claims for hostile work environment.

As an initial matter, LP erroneously asserts that the statute of limitations governing Plaintiff's hostile work environment claim is three years.  It is four years.  *See Jones v. R.R. Donnelley & Sons Co.,* 541 U.S. 369 (2004) (holding that claims arising under the 1991 amendments to section 1981 are governed by the four-year federal statute of limitations set forth in 28 U.S.C. § 1658); *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 291–92 (4th Cir. 2004) (rejecting the E.D. Va.'s holding that Virginia's two-year statute of limitations for personal injury claims applied to all claims brought in Virginia under § 1981 and applying four-year federal statute of limitations). *Accord Guessous v. Fairview Prop. Investments, LLC*, 828 F.3d

208, 223 (4th Cir. 2016) ("Hostile work environment claims under § 1981 are subject to a four year limitation period.").

Because Plaintiff filed this action on January 19, 2018, conduct occurring on or after January 19, 2014 falls within the statutory period. However, "hostile work environment claims under Title VII are also subject to the 'continuing violation' theory for establishing limitations periods which can make the defendant liable for conduct occurring prior to the statutory period as well." *Guessous*, 828 F.3d at 223.

### 2. Application of the continuing violation doctrine.

The Fourth Circuit applies the continuing violation approach articulated in *Morgan*, 536 U.S. 101, a Title VII case, to hostile work environment claims brought under § 1981. *Guessous*, 828 F.3d at 223. Under this approach, the Court must "determine whether the acts about which an employee complains are part of the same actionable hostile work environment, and if so, whether any act falls within the statutory time period." *Morgan*, 536 U.S. at 120. "In other words, even if most of the harassing conduct on which a plaintiff relies to establish her hostile work environment claim occurred outside the statutory period, the claim will be considered timely if at least one act continuing the violation occurred within the statutory period." *Guessous*, 828 F.3d at 222. The application of the continuing violation doctrine is a question of fact. *Edwards v. Murphy-Brown, L.L.C.,* 760 F. Supp. 2d 607, 625 (E.D. Va. 2011). *See also Lewis v. City of Fresno,* No. CV–F–08–1062, 2009 WL 2905738, at *7, 2009 U.S. Dist. LEXIS 80556, at *18 (E.D. Ca. Sept. 3, 2009) ("Whether Plaintiff is entitled to the continuing violation doctrine is a factual inquiry that must be resolved at summary judgment or trial.").

The Fourth Circuit has not clearly defined how courts should determine whether events contribute to the "same actionable hostile work environment." In *Gilliam v. S.C. Dep't Of*

*Juvenile Justice*, 474 F.3d 134, 141 (4th Cir. 2007), the Fourth Circuit concluded that the continuing violation doctrine applied to a claim for hostile work environment where the plaintiff alleged multiple instances of race-based harassment by one supervisor. In *O'Bar v. Lowe's Home Ctrs., Inc*, No. 5:04–CV–00019–W, 2007 WL 604711, at *3–4 (W.D.N.C. Feb. 22, 2007), this district stated that the pre-and post-statutory window claims must be "sufficiently alike to constitute together one continuous chain of events." Similarly, in *Edwards*, the Eastern District of Virginia held "that in order for several events to qualify as part of the same hostile work environment, all of the incidents must be so significantly related to each other as to comprise one unitary and ongoing unlawful employment practice." 760 F. Supp. 2d at 625. There, the court looked to the subject of each incident, the frequency, and whether it was the same group of employees involved. *Id.* at 622–24.

In this case, the Court need not make a finding on whether the continuing violation doctrine applies. Even considering all of the conduct described, Plaintiff's claim for hostile work environment fails. For that reason, the Court assumes, without deciding, that the continuing violation doctrine applies.

3.  The Court only considers "unwelcome conduct" "based on race" in evaluating Plaintiff's hostile work environment claim.

Plaintiff's Opposition describes an extensive list of conduct he contends supports his claim for a hostile work environment because it was based on race. As an initial matter, Plaintiff has failed to produce non-hearsay evidence that the Court may consider at the summary judgement stage for several incidents he cites in support of his claim. *See Md. Highways Contractors Ass'n v. Maryland,* 933 F.2d 1246, 1251 (4th Cir. 1991) ("[H]earsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment."); a*ccord Williams v. Staples, Inc.,* 372 F.3d 662, 667 (4th Cir. 2004) (explaining only admissible

evidence may be considered in resolving motion for summary judgment). Specifically, the Court cannot consider the following incidents listed in Plaintiff's Opposition because he has failed to supply testimony from a witness with personal knowledge of them:

- A temporary employee using the word "n****r" while speaking to another employee, then being promoted. (Doc. No. 32, at 5.)

- An employee named Joshua Fox using the word "n****r" three times during a confrontation with another employee (*Id.* at 6.)

- An employee showing another employee a photo of his gun and stating he would use the gun to "hunt the n****rs with." (*Id.*)

Second, Plaintiff has failed to produce any evidence beyond his own speculation that the pranks he was subjected to were "based on race." Plaintiff argues, without citation, that a "presumption *must* be given that potentially neutral actions taken with respect to minorities . . . are necessarily based on racial animus." (Doc. No. 31, at 18.) The Court declines to apply such a presumption. To establish that harassment was based on race, Plaintiff "must show that 'but for' [his] race . . . , [he] would not have been the victim of the alleged discrimination." *Gilliam v. S.C. Dep't Of Juvenile Justice*, 474 F.3d 134, 142 (4th Cir. 2007) (quoting *Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998). While Plaintiff testified that white employees were not subjected to pranks, general allegations of dissimilar treatment are insufficient. *See Gilliam*, 474 F.3d at 142 (noting that general statements of dissimilar treatment were insufficient to establish that conduct was motivated by racial animosity); *Causey*, 162 F.3d at 802 (explaining that Plaintiff's conclusory statements regarding dissimilar treatment, without specific evidentiary support, cannot support an actionable claim for harassment). Furthermore, LP points out that Plaintiff testified that he did not know why he was subjected to pranks. (Doc. No. 35, at 11.) Accordingly, Plaintiff has failed to establish that but for his race, he would not have been

subjected to pranks by his coworkers. The Court will not consider the pranks as part of the totality of the circumstances it reviews in analyzing Plaintiff's hostile work environment claim.

There can be no genuine dispute that Plaintiff's allegations regarding the three incidents in which another LP employee addressed him using a racial slur were motivated by race. Nor is there any genuine dispute that signs and graffiti depicting the word "n****r," swastikas, and the phrase "KKK" are motivated by race, and that an African American would reasonably perceive the Confederate flag as racist. However, Defendant argues that being called a "drug dealer" is not a "racist statement." Defendant cites two cases in support of its position, which Plaintiff made no effort to distinguish. *See Craig v. Alabama Power Co., Inc.*, No. CV-08-RRA-2329-S, 2010 WL 11561853, at *13 (N.D. Ala. July 26, 2010), *report and recommendation adopted sub nom. Craig v. Alabama Power Co.,* No. 2:08-CV-2329-VEH, 2010 WL 11561855 (N.D. Ala. Sept. 21, 2010) (finding comment that plaintiff was a drug dealer was not *per se* racial in nature, and noting "there is no evidence that this particular comment was made more than once, or that it was intended as anything more than a joke"); *Davis v. Kroger Co*., No. CIV.A.3:07-CV-1130-L, 2010 WL 1267223, at *7 (N.D. Tex. Mar. 31, 2010), *aff'd sub nom. Davis v. Kroger Texas LP*, 429 F. App'x 376 (5th Cir. 2011) (finding that "there is no racial overtone" to comment that plaintiff was a drug dealer, noting the plaintiff "[did] not explain why these comments are racially insensitive, nor [ ] shown that they were prompted because of his skin color"). The Court agrees with Defendant, noting that Plaintiff has provided no basis for a conclusion the comment was based on his skin color.

> 4. Plaintiff has not demonstrated the conduct alleged is objectively "severe or pervasive."

The third element of a hostile environment claim requires that the offending conduct be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an

abusive working environment." *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333 (4th Cir. 2003) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)) (alterations omitted). This element has both a subjective and objective component, i.e., the employee must both personally and reasonably believe that the conduct rises to the level of a hostile environment. *Id.* (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993)).

In assessing whether harassment is objectively abusive, courts must examine the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Strothers v. City of Laurel, Maryland*, 895 F.3d 317, 331 (4th Cir. 2018) (citing *Harris*, 510 U.S. at 23). The Court may only consider acts of harassment of which Plaintiff had knowledge. *Daso v. Grafton School, Inc.*, 181 F. Supp. 2d 485, 492 (D. Md. 2002) ("Events which occurred without the knowledge of Plaintiff could not have contributed to his perception that the workplace was hostile."); *Norris v. City of Anderson*, 125 F. Supp. 2d 759, 768–69 (D.S.C. 2000) ("Events of which Plaintiff had no knowledge cannot support a hostile environment claim, because a person cannot perceive an act as hostile if he is not aware of its existence."). Finally, the Fourth Circuit has repeatedly held that "a plaintiff pressing a hostile work environment claim must substantiate his claim with reasonable specifics about the alleged incidents that underlie the claim." *Skipper v. Giant Food Inc.*, 68 F. App'x 393, 399 (4th Cir. 2003) (unpublished) (citing *Carter v. Ball*, 33 F.3d 450, 461–62 (4th Cir. 1994)). "Reasonable specifics" includes dates and names of the individuals involved. *Id.*

This case is factually similar to *Skipper*. There, the plaintiff alleged (1) that his manager harassed him by following him throughout the warehouse and referring to him by a racial slur on

one occasion; (2) that he overheard Caucasian workers using the same racial slur thirteen times in the four years prior to filing this lawsuit; and (3) that he was exposed daily to racist graffiti in warehouse trailers and restrooms. 68 F. App'x at 399. Affirming grant of summary judgement in favor of the plaintiff's employer, the Fourth Circuit explained that the plaintiff's allegations about harassing conduct lacked sufficient reasonable specificity. The court noted that the plaintiff "could not recall the name of even a single white employee who uttered the offensive words, aside from one incident" with his manager. *Id.* In addition, the Fourth Circuit concluded that "the presence of offensive graffiti alone cannot sustain" a claim for hostile work environment. *Id.*

The Court finds *Skipper* instructive. Here, Plaintiff can identify two coworkers who addressed him using racial slurs. However, Plaintiff admits that one coworker apologized after Plaintiff reported the incident to management. Plaintiff cannot identify the individual who placed the sign depicting the word "n****r" on his locker in approximately 2005, but the Court notes that act was clearly designed to be anonymous. Plaintiff does not recall if he complained to LP about the sign. Despite the fact that this sign appeared shortly after he was transferred to the maintenance team, Plaintiff does not claim that his upward trajectory in the maintenance department was affected.[3] Plaintiff also provided specific testimony that a cartoon depicting someone shooting President Obama was placed on his locker, and that he observed the word "n****r" and the phrase "KKK" scratched into a bathroom stall in a bathroom he frequently used. However, Plaintiff could not identify a single LP employee or manager who displayed a confederate flag, offensive bumper sticker, or told a racist joke. Plaintiff could not provide

---

[3] Undisputed evidence in the record demonstrates that Plaintiff was promoted and given pay raises over the course of his tenure at LP. (Doc. Nos. 22–8, 22–9, 22–10.)

approximate dates, beyond an estimate of the year, for all but one of the incidents he described. Houpe similarly failed to provide any specifics about the incidents he witnessed, including names and dates.[4]  Beyond non-specific testimony that an unnamed LP manager displayed a confederate flag on a lunchbox or hard hat, there is no evidence Plaintiff witnessed any LP manager or supervisor engage in racial harassment.

Citing eight incidents, Plaintiff argues that the use of the word "n****r" at LP is severe and pervasive such that "LP oozed discrimination from every pore."  (Doc. No. 32, at 17–18.) The Court agrees the use of the term "n****r" is abhorrent whether used once or many times. However, Plaintiff fails to provide non-hearsay evidence the Court may consider on motion for summary judgment for three of the described incidents, and fails to provide any evidence Plaintiff had knowledge of two additional alleged incidents.[5]  Accordingly, the Court may not consider a majority of the incidents in which Plaintiff argues the epithet was used in evaluating Plaintiff's hostile work environment claim.  The remaining three are: (1) the sign placed on Plaintiff's locker in approximately 2005; (2) the use of the slur by Connelly Howard in 2015; and (3) graffiti in the bathroom that Plaintiff observed.[6]  Plaintiff cites no case in which three uses of the word "n****r," two in writing and none by a supervisor, over the course of ten years has been held to create a hostile work environment.

---

[4] In addition to this issue, there is no evidence in the record that Plaintiff was aware of the incidents described by Houpe during the term of his employment at LP.  LP points out that Plaintiff testified he was not aware of Houpe experiencing any discriminatory acts at LP.  (Doc. No. 35, at 9.)  Therefore, Houpe's testimony cannot be cited in support of Plaintiff's hostile work environment claim.

[5] Plaintiff's Opposition also discusses the use of the slur "coon" at LP.  Again, the Opposition cites to the testimony of Houpe, not Plaintiff, to describe these incidents.  (*See* Doc. No. 32, at 7, citing Doc. No. 32–2.)  Plaintiff did not testify that he heard the word "coon" used at LP.  (*See* Doc. No. 32–9.)

[6] Plaintiff's Opposition cites to the deposition testimony of Houpe, not Plaintiff, to describe how the word "n****r" was displayed as graffiti at LP.  (*See* Doc. No. 32, at 6.)

Based on available and appropriately considered evidence, the Court concludes Plaintiff has failed to establish that the offending conduct he was exposed to was objectively "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Reviewing those incidents to which Plaintiff has testified with reasonable specificity, Plaintiff has described a series of infrequent incidents that occurred over a ten-year period that cannot rise to the "severe or pervasive" level required for a hostile work environment claim. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (explaining "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment") (internal citations and quotation marks omitted).

Importantly, Plaintiff has provided no evidence that any supervisor ever harassed him. "In measuring the severity of harassing conduct, the status of the harasser may be a significant factor—e.g., 'a supervisor's use of [a racial epithet] impacts the work environment far more severely than use by co-equals.'" *Boyer-Liberto*, 786 F.3d at 278 (quoting *Rodgers v. W.–S. Life Ins. Co.,* 12 F.3d 668, 675 (7th Cir.1993)). While the Court finds the fact that Plaintiff's coworkers addressed him with racial slurs on three occasions repugnant, three incidents over a ten-year period of employment do not create a hostile work environment, even combined with the display of racist graffiti in bathrooms and one incident in which a racist cartoon was placed on Plaintiff's locker. *Skipper*, 68 F. App'x at 399 (affirming grant of summary judgment in favor of employer on hostile work environment claim where manager harassed plaintiff by following him around and referring to him by a racial slur on one occasion, coupled with daily exposure to racist graffiti and the Plaintiff overhearing other employees use the same slur thirteen times in a four year period); *Irani v. Palmetto Health*, 767 F. App'x 399, 417 (4th Cir. 2019) (unpublished)

(affirming grant of summary judgment in favor of employer where supervisor made racist comments to employee, noting "while the comments made in this case are odious, there is no evidence to suggest that the infrequent comments -- two comments over an 18 month period -- were so severe or pervasive as to be actionable"). *See also Barrow v. Georgia Pac. Corp*., 144 Fed. Appx. 54, 57 (11th Cir. 2005) (unpublished) (allegations that Plaintiff (1) saw displays of rebel flag on tool boxes and hard hats; (2) observed the letters "KKK" on a bathroom wall; (3) saw a noose in another employee's locker; (4) was called "n****r" three times in one year by a superintendent; and (4) was told a superintendent would kick his "black ass" and that if he looked at "that white girl" the superintendent would "cut" him were insufficiently severe and pervasive as they occurred over a fourteen year period). *C.f. Anderson v. G.D.C., Inc.,* 281 F.3d 452, 459 (4th Cir. 2002) ("Anderson was subjected, on a daily basis, to verbal assaults of the most vulgar and humiliating sort. Such evidence suffices to create a jury question regarding whether the harassing conduct was sufficiently severe or pervasive to alter the terms and conditions of employment.")

Like the plaintiff in *Barrow*, Plaintiff has presented evidence of "isolated, sporadic instances of racial harassment over his" ten years of employment at LP, and unlike the plaintiff in *Barrow*, adduced no evidence that he was ever harassed by a supervisor. *Barrow*, 144 Fed. Appx. at 57. During this time, he was promoted and given pay raises. Accordingly, Plaintiff has failed to establish that any reasonable finder of fact could conclude that he experienced harassment so "severe or pervasive" as to alter the terms of his employment. Therefore, the Court grants Defendant's motion for summary judgment on Plaintiff's hostile work environment claim.

**5.** **Plaintiff has failed to establish a basis for imputing the alleged harassment to LP.**

Even if Plaintiff had alleged that he was subjected to harassment objectively severe or pervasive such that a reasonable factfinder could conclude that a hostile work environment existed at LP, his claim still fails because he has not established that any of the alleged harassment could be imputable to LP. In order to survive a motion for summary judgment on a hostile work environment claim where the harasser is a coworker, the employee must show that the employer was "negligent in controlling working conditions"—that is, the employer "knew or should have known about the harassment and failed to take effective action to stop it." *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013).

LP argues that the acts of harassment Parks experienced cannot be imputed to it because it took actions to stop all harassment Parks reported, and cannot be liable for harassment Parks did not report. (Doc. No. 26, at 22–23.) It further argues it cannot be charged with constructive knowledge of the harassment because it provided adequate avenues for Plaintiff to complain. LP attached its written anti-harassment policy, anti-retaliation policy, equal employment opportunity policy, and affirmative action policy to its summary judgment filings. (Doc. Nos. 22–12, 22–13, 22–14, 22–15.) LP further points out that Parks testified he was aware of these policies, and testified he observed that LP had a 1-800 phone number for complaints posted publicly. (Doc. No. 35, at 12–13.) Finally, LP argues that after Parks complained of incidents to management, the mistreatment stopped. (Doc. No. 26, at 23.)

In response, Plaintiff argues that LP would have to be "willfully, defiantly ignorant of its own goings-on" to argue that it did not know about the "racism permeating its walls." (Doc. No. 32, at 19.) Specifically, Plaintiff argues that the following facts support its argument: (1) two confederate flag stickers adorned the common entrance of LP; (2) swastikas and the word

"n****r" appeared in bathrooms; (3) "racial slurs flew on a routine basis;" (4) employees were comfortable posting anti-Islam materials on company property; and (5) employees' vehicles "contained the first African-American president in the crosshairs of a gun." (Doc No. 31, at 19.) Plaintiff does not address LP's argument that it had clear policies that Plaintiff could use to complain, nor that mistreatment stopped after Plaintiff did complain.

As an initial matter, the issue before the Court is whether "a reasonable jury could find *plaintiff's* harassment" is imputable to LP. In considering whether Plaintiff's harassment is imputable to LP, the Court only considers those acts which Plaintiff himself testified to as the basis for his hostile work environment claim, not a general atmosphere at LP. Houpe, not Plaintiff, testified that he observed "two confederate flag stickers adorned the common entrance of LP." (Doc. No. 32, at 8.) Nor did Plaintiff testify he observed swastikas in bathrooms at LP. (*See* Doc. No. 32–9 at 47 (discussing that Plaintiff saw swastikas on people's vehicles).) Plaintiff testified only that he saw the word "n****r" and the phrase "KKK" etched into the stalls of the bathroom he used most frequently. While Plaintiff did observe a bumper sticker equating President Obama to Osama Bin Laden and depicting a swastika, he did not testify he saw a bumper sticker depicting President Obama in the crosshairs of a gun.

In order to analyze whether the harassment Plaintiff alleges is imputable to LP, the incidents must be broken down into two categories: those which LP had actual knowledge of due to Plaintiff's complaints, and those which LP "should have known" about.

First, the Court reviews the incidents that LP had actual knowledge of by virtue of Plaintiff's complaints. It is undisputed that LP had anti-harassment policies. "While the 'adoption of an effective anti-harassment policy is an important factor in determining whether [an employer] exercised reasonable care,' the policy must be effective in order to have

meaningful value." *Sunbelt Rentals,* 521 F.3d at 320 (quoting *Smith v. First Union Nat. Bank*, 202 F.3d 234, 244 (4th Cir. 2000)).  Evidence establishes that harassment consistently stopped after Plaintiff complained about it to LP.  First, Plaintiff complained to LP both times Dancy and Howard addressed him verbally with a slur.  Dancy subsequently apologized to Plaintiff and never made another offensive comment.  While Howard never apologized, he also never harassed Plaintiff again.  Plaintiff also complained when a cartoon depicting President Obama was taped to his locker.  Plaintiff testified he never had any issues with the cartoon again.  Based on the fact that each incident of harassment stopped after Plaintiff complained, and one coworker even apologized, the Court finds that Plaintiff has failed to put forth evidence that LP "failed to take effective action to stop" the harassment of plaintiff it had actual knowledge of. Accordingly, these acts are not imputable to LP.

Next, the Court considers those acts which Plaintiff did not complain about to LP: (1) the racist graffiti he observed in a bathroom; (2) the offensive bumper sticker he observed on a vehicle in the LP parking lot; and (3) the offensive sign placed on his locker in 2005.  Plaintiff's Opposition fails to supply any evidence to support a conclusion that LP should have known about each incident.  Instead, it cites myriad allegations Plaintiff did not actually make, apparently arguing that LP should have been aware of a generally offensive workplace environment and therefore these specific acts of harassment are imputable.  (Doc. No. 26, at 23.) Plaintiff cites no caselaw in support of this argument.  The Court therefore concludes that Plaintiff has failed articulate a basis for imputing these instances of harassment to LP.

In summary, not only has Plaintiff failed to establish that he was exposed to harassment so severe or pervasive as to create a hostile work environment, he also fails to adduce evidence

that could cause the alleged harassment to be imputed to LP.   For this reason, too, the Court grants Defendant's motion for summary judgment on Count I.

### B. Disparate Treatment Claim

Plaintiff next alleges that LP subjected him to disparate treatment based on his race.  42 U.S.C. § 1981 "prohibits racial discrimination in the making and enforcement of contracts."   To establish a prima facie case of racially disparate treatment pursuant to § 1981, the plaintiff employee must demonstrate that (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) his job performance was satisfactory at the time of the adverse employment action; and (4) he was treated differently from similarly situated employees outside his protected class. *See Goode v. Cent. Va. Legal Aid Soc'y, Inc.*, 807 F.3d 619, 626 (4th Cir. 2015).  The elements of a prima facie claim of discrimination based on disparate treatment under § 1981 and a discrimination claim under Title VII are the same.  *Gairola v. Commonwealth of Virginia Dep't of General Serv.,* 753 F.2d 1281, 1285–86 (4th Cir. 1985).

Courts analyze race discrimination and retaliation claims filed under 42 U.S.C. § 1981 using the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under this framework, Plaintiff must first establish a prima facie case of disparate treatment or retaliation.  *Id.* at 802.  After Plaintiff has plead a prima facie case, the burden then shifts to Defendant to articulate some legitimate, nondiscriminatory reason for Plaintiff's termination. *Id.*

The Fourth Circuit has held that "'when an employer articulates a reason for discharging the plaintiff' that the statute does not proscribe, 'it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination.'"  *Villa v. CavaMezze Grill, LLC,* 858 F.3d 896, 901 (4th Cir. 2017)

(*quoting DeJarnette v. Corning Inc.,* 133 F.3d 293, 299 (4th Cir. 1998)). However, if a jury

could find the "proffered explanation for the discharge . . . 'unworthy of credence,'" then

summary judgment for the employer is improper. *Merritt v. Old Dominion Freight Line, Inc.,*

601 F.3d 289, 295 (4th Cir. 2010) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248,

256 (1981)).

Plaintiff's claim for disparate treatment fails as he cannot establish elements two and four

of a prima facie case. Moreover, even if Plaintiff could establish all elements of a prima facie

case, he has presented no evidence that LP's stated reason for firing him was pretextual. For

these reasons, the Court grants Defendant's motion for summary judgment on Count II.

> 1.  Plaintiff cannot establish a prima facie case of disparate treatment because he cannot demonstrate satisfactory job performance.

LP argues that Plaintiff cannot state a prima facie case of discrimination based on

disparate treatment because he cannot establish that he performed his job satisfactorily. (Doc.

No. 26, at 9.) LP further argues that its investigation determined that Plaintiff's violation of the

LOTO policy was "willful," and that any argument by Plaintiff that his violation of the LOTO

policy should be considered a mistake must be disregarded. In support of this, LP cites *Evans v.

Techs. Applications & Serv. Co*., 80 F.3d 954, 960–61 (4th Cir. 1996), in which the Fourth

Circuit stated "[i]t is the perception of the decision maker which is relevant, not the self-

assessment of the Plaintiff." (*Id.* at 10.)

The Court agrees. In order to create a triable issue regarding the issue of satisfactory job

performance, "a plaintiff must proffer evidence of a genuine dispute concerning whether, 'at the

time of his dismissal, he was performing his job in a way that met the legitimate expectations of

[the defendant].'" *Reid v. Dalco Nonwovens, LLC*, 154 F. Supp. 3d 273, 285 (W.D.N.C. 2016)

(quoting *Pettis v. Nottoway Cnty. Sch. Bd.*, 980 F.Supp.2d 717, 725 (E.D. Va. 2013)). Plaintiff

offers no such evidence here.

Instead, Plaintiff argues that violation of the LOTO policy was not clear grounds for

termination, and that this establishes an issue of fact as to whether he was performing his job in a

satisfactory manner. (Doc. No. 32, at 13.) Plaintiff states that LP had "leeway" in deciding

Plaintiff's punishment, and that leeway, "viewed in light of [Plaintiff's] comparators and LP's

overwhelming racism, creates a genuine issue of material fact as to whether [Plaintiff's] violation

was sufficiently severe to render his performance below his employer's legitimate expectations

or whether LP has simply used that as an excuse to terminate the black maintenance worker it

never wanted.[7]" (*Id.*) Plaintiff cites no cases in support of his argument, and the Court finds it

unpersuasive.

The issue of satisfactory job performance has nothing to do with punitive measures taken

by employers after misconduct—it is about the misconduct itself. In this case, Plaintiff admits

he violated LP's written LOTO policy, which specifically states any violation will be viewed as

"serious misconduct." Plaintiff does not dispute that he knew of the policy and had been trained

---

[7] The Court observes that the posture of Plaintiff's disparate treatment claim is more akin to that
of a discriminatory discipline claim. That claim would also fail. To establish a prima facie case
of discrimination in the enforcement of employee disciplinary measures, the plaintiff must show:
(1) that he is a member of a class protected by Title VII, (2) that the prohibited conduct in which
he engaged was comparable in seriousness to misconduct of employees outside the protected
class, and (3) that the disciplinary measures enforced against him were more severe than those
enforced against those other employees. *See Cook v. CSX Transp. Corp.,* 988 F.2d 507, 511 (4th
Cir. 1993); *Moore v. City of Charlotte,* 754 F.2d 1100, 1105–06 (4th Cir. 1985). However,
because Plaintiff admits white employees were in fact terminated for LOTO violations, he cannot
state a prima facie case. *McDougal-Wilson v. Goodyear Tire & Rubber Co.,* 427 F. Supp. 2d
595, 610 (E.D.N.C. 2006) ("If the plaintiff's discipline fell within a range of discipline imposed
on white employees for the specific violation, then 'there was no disparity of treatment from
which one could conclude that [plaintiff's] discipline was a product of [illegal] discrimination.'")
(quoting *Cook*, 988 F.2d at 512).

on it.  Plaintiff does not dispute the content of the investigation report on his LOTO violation, which states Plaintiff admitted he did not perform the verification step before beginning work on the machine because he was "in a hurry" and "assumed" he had correctly locked out the machine.  Accordingly, undisputed evidence in the record clearly shows that Plaintiff was not performing his job satisfactorily or within LP's legitimate expectations.  The fact that other employees also violated the LOTO policy has no bearing on the issue of whether Plaintiff was satisfactorily performing his job.

For these reasons, Plaintiff has failed to demonstrate he performed his job satisfactorily. As such, he cannot state a prima facie case of disparate treatment, the presumption that his termination was based on discrimination cannot apply, and summary judgment in favor of LP is appropriate on Count II.

> 2.      Plaintiff has not presented evidence of different treatment from similarly situated employees outside of a protected class.

Even if Plaintiff did show that he was performing his job in a satisfactory manner at the time of his termination, he has not shown that he was treated differently compared to similarly situated employees from a non-protected class.  Where "plaintiffs have based their allegations completely upon a comparison to an employee from a non-protected class, [ ] the validity of their prima facie case depends upon whether that comparator is indeed similarly situated . . . plaintiffs are required to show that they are similar in all relevant respects to their comparator." *Haywood v. Locke,* 387 Fed. Appx. 355, 359 (4th Cir. 2010) (citations omitted). "Such a showing would include evidence that the employees 'dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Id.* (citing *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 583 (6th Cir. 1992)). "Generally, the

compared employees must have dealt with the same decision-maker and engaged in conduct of comparable seriousness . . ." *Chamberlain v. Securian Fin. Grp., Inc.,* 180 F. Supp. 3d 381, 404 (W.D.N.C. 2016) (quotation omitted).

The crux of Plaintiff's disparate treatment claim is his allegation that LP did not fire some Caucasian employees for LOTO violations. LP responds that Plaintiff improperly expands the universe of comparators to include those employees whose LOTO violations were not deemed "willful" by LP investigators. LP argues that Plaintiff's conduct was deemed more serious because it was found to be "willful," and notes that there is no evidence LP failed to terminate an individual for committing a "willful" LOTO violation. LP also argues that Plaintiff has failed to establish that these alleged comparators were similarly situated to Plaintiff because their LOTO violations were investigated by a different group of individuals.

During oral argument, counsel for Plaintiff admitted there is no evidence that LP failed to terminate an employee found to have willfully violated the LOTO policy. However, Plaintiff argues that LP had "leeway" in deciding how to punish Plaintiff for the LOTO violation. (Doc. No. 32, at 12.) Plaintiff's argument appears to be that LP had discretion in determining whether or not a "willful" LOTO violation occurred and used that discretion in a discriminatory manner. Plaintiff points in particular to an incident in which an LP employee named Charlie Dixon injured his finger while working on a running machine but was not terminated. Plaintiff also points to the fact that four Caucasian employees were not fired for a LOTO violation just a month prior to Plaintiff's termination. Though Plaintiff asserts that these other employees who were not terminated should be considered his comparators, his factual assertions as to their misconduct falls short of showing they are similarly situated within the meaning of the

employment discrimination analysis outlined above. Indeed, Plaintiff's Opposition contains no facts at all regarding the actual misconduct of the alleged comparators.

During oral argument, LP distinguished Dixon's LOTO violation from Plaintiff's. LP stated that Dixon was adjusting a "cam roller on a ripper machine" and that in order to adjust a cam roller properly, the machine must be running so that one can see the effects of the adjustments. LP stated that while Dixon technically committed a LOTO violation, the standard operating procedure for the ripper machine did not address the proper way to adjust the cam roller given its unique situation. LP felt that it was at fault for not articulating a clear process for adjusting the cam roller, and amended the machine's procedure immediately. For this reason, Dixon's LOTO violation was not deemed "willful." LP also distinguished Plaintiff's violation from that of the four Caucasian employees that occurred a month prior to Plaintiff's termination. LP explained that, unlike Plaintiff, these four employees did lock out and verify the machine they were working on was deenergized before they began work; however, they failed to lock out surrounding equipment. LP determined that "this was due to a miscommunication where the manufacturing team had not told the maintenance team about the need to lockout surrounding equipment" and was therefore, not a willful violation. (Doc. No. 26, at 13.)

Here, however, undisputed evidence establishes that Plaintiff knew of the LOTO policy as it applied to the machine he was working on, knew he did not verify the machine he was working on had no energy, and proceeded to begin work anyway because he assumed that he had locked out the correct machine. Plaintiff told LP investigators he was in a hurry to get the job done. No mitigating circumstances existed. Furthermore, LP points to a LOTO violation committed by a former LP employee named James Darnell that is substantially similar to Plaintiff's violation. Darnell, who is Caucasian, failed to verify no energy after completing the

lockout step of the LOTO policy, and his violation was deemed willful due to no mitigating circumstances. He was terminated in 2013. Plaintiff fails to address or distinguish Darnell's substantially similar conduct in his briefing, or LP's point that *all* "willful" LOTO violations resulted in termination.

Plaintiff also does not address LP's argument that the investigators who recommended his termination were not the same investigators who reviewed the actions of the alleged comparators. Plaintiff provides no evidence that would allow for an adequate comparison between the different teams of investigators. Therefore, he has failed to demonstrate that he is similar in all relevant respects to these alleged comparators. *See Forrest v. Transit Mgmt. of Charlotte, Inc.*, 245 F. App'x 255, 257 (4th Cir. 2007) (unpublished).

Finally, Plaintiff's citation to various statistics regarding the number of Caucasian LP employees terminated for LOTO violations does not save his claim. Again, Plaintiff must establish that he is "similar in all relevant respects to [his] comparator" from a non-protected class. *Haywood*, 387 F. Appx. at 359. Citation to bald statistics does not satisfy Plaintiff's burden to demonstrate he and the alleged comparators are alike "with respect to performance, qualifications, and conduct." *Popo v. Giant Foods LLC*, 675 F. Supp. 2d 583, 589 (D. Md. 2009) (quoting *Radue v. Kimberly–Clark Corp.,* 219 F.3d 612, 617 (7th Cir. 2000)).

Accordingly, Plaintiff has failed to establish that he was treated in a manner different than a member of a non-protected class that engaged in substantially similar conduct. For this reason too, he fails to state a prima facie claim for disparate treatment and the Court will grant LP's motion as to Count II.

Finally, Plaintiff's claim for disparate treatment would still fail even if he did establish a prima facie case because he fails to put forward evidence that LP's stated reason for firing Plaintiff, the LOTO violation, was contrived. "[T]o establish that a proffered reason for the challenged action was pretext for discrimination, the plaintiff must prove '*both* that the reason was false, *and* that discrimination was the real reason' for the challenged conduct." *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 377–78 (4th Cir. 1995) (quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515 (1993)).   Here, Plaintiff has failed to provide any evidence that creates a question of fact as to whether the LOTO violation was the real reason for his termination.

In his Opposition, Plaintiff argues that he provided evidence that his firing was pretextual because "77% of white LOTO violations end without termination, even when the circumstances are similar" and because he can "show a horrifying environment at LP."  (Doc. No. 32, at 14.)  Plaintiff also argues that LP does not have an objective standard for punishment of LOTO violations.

Plaintiff's opposition fails to persuade the Court.  As discussed *supra*, Plaintiff lumps all LOTO violations together without appropriately distinguishing between Plaintiff's "willful" violation and situations where LP reasonably found mitigating circumstances existed.  Further, Plaintiff fails to address the fact that Darnell committed a substantially similar LOTO violation in 2013 and was, in fact, terminated by LP.  Finally, Plaintiff's arguments about the lack of objective standard for determining "willfulness" of a LOTO violation ring hollow as Plaintiff admitted to LP investigators that he knew he was supposed to verify no-energy before beginning work, but failed to do so because he assumed he had locked out the correct machine and because he was in a rush.  Plaintiff's own admission clearly establishes that he willfully violated the

LOTO policy.  He admits that every LOTO violation deemed "willful" by LP resulted in termination of the violator.  He has failed to provide any evidence demonstrating that LP determined the "willfulness" of LOTO violations in a discriminatory manner. Accordingly, Plaintiff has failed to establish that LP's stated reason for his termination was false, and therefore pretextual.

### C.    Retaliation Claim

Finally, Plaintiff asserts that LP retaliated against him for engaging in a protected activity.  A prima facie retaliation claim under § 1981 has the same elements as a retaliation claim under Title VII. *See Honor v. Booz–Allen & Hamilton, Inc.,* 383 F.3d 180, 188 (4th Cir. 2004).  Under Title VII, a plaintiff establishes a prima facie claim for unlawful retaliation by showing: (1) he engaged in protected activity; (2) he experienced an adverse employment action; and (3) a causal link exists between the two events. *See Balas v. Huntington Ingalls Indus., Inc.,* 711 F.3d 401, 410 (4th Cir. 2013); *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405–06 (4th Cir. 2005).  After Plaintiff has plead a prima facie case, the burden then shifts to Defendant to articulate some legitimate, nondiscriminatory reason for Plaintiff's termination. *McDonnell Douglas Corp.*, 411 U.S. at 802.

### 1.    Plaintiff fails to establish a prima facie case of retaliation.

LP argues that Plaintiff cannot state a prima facie claim because he cannot establish causation.  Specifically, LP points out that Plaintiff (1) admitted in his deposition that LP fired Plaintiff for violating the LOTO policy; and (2) has no evidence that the investigator who "recommended" his termination had knowledge of his complaints.[8]  (Doc. No. 26, at 16.)

---

[8] During oral argument, counsel for LP stated that the investigators' recommendations to terminate those found to have "willfully" violated the LOTO policy were always followed by LP management. This statement was not refuted by Plaintiff's counsel.

In response, Plaintiff argues that causation can be established by temporal proximity. (Doc. No. 32, at 14.)  He contends that he complained about discrimination twice in "February or March of 2015."  Specifically, Plaintiff complained about his locker being stuffed with freeze pop wrappers and the incident when Connelly Howard addressed Plaintiff using the word "n****r".  (*Id.* at 15; Doc. 32-9 at 39, 53.)  Plaintiff could not recall the exact date of either complaint, but points out that even if both occurred on February 1, 2015, that would be at most seven weeks prior to his termination.  Plaintiff does not address LP's argument regarding lack of any evidence that the LP investigators had knowledge of Plaintiff's complaints.

While temporal proximity is one element of causation, "because [Title VII's] focus is the employer's subjective motivation for the action, the facts the decision-maker actually perceived matter." *Villa*, 858 F.3d at 901.  *See also Dowe v. Total Action against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) ("[B]y definition, an employer cannot take action because of a factor of which it is unaware.").   As there is no evidence in the record that the investigators had any knowledge of Plaintiff's complaints, Plaintiff cannot state a claim for retaliation against LP.  For this reason, the Court grants Defendant's motion for summary judgment on Count III.

> 2.      Even if Plaintiff did establish a prima facie case of retaliation, he fails to submit evidence that the reason for his firing was pretextual.

Further, even if Plaintiff did establish a prima facie case of retaliation, he has again failed to submit evidence of pretext. Plaintiff may prove pretext by showing that the alleged nondiscriminatory "explanation [for termination] is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of [retaliation]." *Lloyd v. New Hanover Reg'l Med. Ctr.*, No. 7:06-CV-130-D, 2009 WL 890470, at *5 (E.D.N.C. Mar. 31,

2009), *aff'd*, 405 F. App'x 703 (4th Cir. 2010) (quoting *Mereish v. Walker,* 359 F.3d 330, 336 (4th Cir. 2004)).

Here, even viewing the evidence in a light most favorable to Plaintiff, there is no genuine issue of material fact as to pretext. Plaintiff refers the Court to his arguments that he has shown pretext as to his disparate treatment claim. For the same reasons stated *supra*, Plaintiff's alleged evidence of pretext fails to establish any issue of fact as to the reason for his termination. Again, Plaintiff admits he willfully violated the LOTO policy, and admits that LP terminates every employee found to have committed willful LOTO violations. He has failed to produce evidence that the determination of "willfulness" was made in a discriminatory manner. For this reason, there is no factual dispute as to the reason for his termination and his retaliation claim must fail.

## IV.    ORDER

**NOW THEREFORE IT IS ORDERED THAT**:

Defendant's "Motion for Summary Judgment" (Doc. No. 18) is **GRANTED,** Plaintiff's Complaint is **DISMISSED**, and **SUMMARY JUDGMENT** is hereby entered in favor of Defendant on the claims in this action. The Clerk of Court is directed to close this case.

**SO ORDERED ADJUDGED AND DECREED**.

Signed: August 20, 2019

Kenneth D. Bell
United States District Judge